United States District Court
Southern District of Texas
**ENTERED**
September 09, 2020
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| TRAFIGURA TRADING LLC, §<br>Plaintiff, §<br>§<br>VS. §<br>§<br>UNITED STATES OF AMERICA, §<br>Defendant. § | CIVIL ACTION NO. 4:19-CV-170 |

## ORDER

The Export Clause of the Constitution states: "No Tax or Duty shall be laid on Articles exported from any State." U.S. Const., Art. I, § 9, cl. 5. From 2014 to 2017, Plaintiff Trafigura Trading LLC ("Trafigura") paid $4,215,924 in taxes pursuant to 26 U.S.C. § 4611(b). That provision imposes a "tax on . . . domestic crude oil . . . exported from the United States" on a per-barrel basis. These funds, at least in theory, are paid into the Oil Spill Liability Trust Fund. This case presents the question of whether the taxes assessed on the oil exported by Trafigura under 26 U.S.C. § 4611(b) are unconstitutional taxes on exports or legitimate and constitutional user fees.

### I.

### A.

Trafigura is an "independent commodity trading and logistics house[]." (Doc. No. 21 at 9). As part of its business, Trafigura purchases and exports domestic crude oil from the United States by vessel and truck. From 2014 through 2017, Trafigura exported approximately 50 million barrels of crude oil that was produced in oilfields in Texas, Louisiana, and North Dakota. Over these four years, Trafigura contends it paid a total of $4,215,924 in taxes pursuant to 26 U.S.C. § 4611(b). *See* (Doc. Nos. 21-6, -7, -8 & -9).

In late 2017, Trafigura filed IRS Forms 720X requesting a refund of the taxes it paid under § 4611(b) arguing that the taxes were unconstitutional under the Export Clause of the Constitution. The IRS audit division denied Trafigura's request. Trafigura appealed, and the IRS appeals division denied Trafigura's protest because it "does not consider arguments based on constitutional grounds." (Doc. No. 21-13 at 1).

Trafigura timely filed this suit seeking a refund of the taxes that it alleges were unconstitutionally assessed. The Government does not contest the facts set out above. Instead, the Government argues that the burden imposed under § 4611(b) is a constitutionally valid user fee under the test set out in *United States v. U.S. Shoe Corp.*, 523 U.S. 360 (1998).

**B.**

Before considering the constitutionality of the taxes imposed on Trafigura, some context is appropriate. Under § 4611(b)(1), a tax is imposed on domestic crude oil if it is: (A) "used in or exported from the United States"; and (B) "before such use or exportation, no tax was imposed on such crude oil under [§ 4611(a)]." The tax imposed by § 4611(b) is "the sum of the Hazardous Substance Superfund financing rate, and…the Oil Spill Liability Trust Fund financing rate." 26 U.S.C. § 4611(c)(1). Since the Hazardous Substance Superfund financing rate expired, the operative figure is the Oil Spill Liability Trust Fund financing rate, which is equivalent to 8 or 9 cents per barrel of crude oil, depending on the date of export. § 4611(c)(2)(B).

The funds derived from this provision are "appropriated" to the Oil Spill Liability Trust Fund (the "Fund"). *See* 26 U.S.C. § 9509(b)(1). The Third Circuit has succinctly described the Fund before:

> The Oil Spill Liability Trust Fund, administered by the Coast Guard, serves much like insurance for the oil transportation industry. Companies that import oil into the United States pay a per-barrel fee into the Trust Fund. When a tanker vessel spills oil, the OPA assigns liability for the cleanup to a "responsible party"—typically the

2

owner of the vessel from which the oil spilled. The responsible party is liable for all cleanup costs associated with the spill. If the costs exceed a liability cap established by the OPA, the Trust Fund reimburses the responsible party for all expenses above the statutory cap. Liability under the OPA does not preclude a responsible party from bringing any claims it has against a third party under any other law. The United States, to the extent the Trust Fund has reimbursed the responsible party's costs, steps into the shoes of the responsible party as subrogee and may pursue claims against a third party as if it were the responsible party. Any recovery won by the United States is returned to the Trust Fund to cover future oil spill reimbursements.

*In re Frescati Shipping Co., Ltd.*, 886 F.3d 291, 309 n.24 (3d Cir. 2018), *aff'd CITGO Asphalt Ref. Co. v. Frescati Shipping Co., Ltd.*, 589 U.S. ___ (2020) (slip op.).

## C.

Trafigura filed a motion for summary judgment contending there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. (Doc. No. 22). The Government filed a response. (Doc. Nos. 32 & 47). Trafigura replied. (Doc. No. 33). The Government filed a sur-reply. (Doc. No. 40). The Court held a hearing on the matter, and both sides submitted supplemental briefing. (Doc. Nos. 43, 44, 48, 49). As a part of its supplemental briefing, the Government also filed a motion for summary judgment to "provide the Court a procedural vehicle to rule in favor of the government." (Doc. No. 44). Given the circumstances, the Court deems this cross-motion to be timely.

## III.

The Export Clause of the Constitution states: "No Tax or Duty shall be laid on Articles exported from any State." U.S. Const., Art. I, § 9, cl. 5. The clause was proposed to alleviate the "fear[] that the Northern States would control Congress and would use taxes and duties on exports to raise a disproportionate share of federal revenues from the South." *United States v. International Business Machines Corp.*, 517 U.S. 843, 859 (1996). Rather than tailor a narrow solution to this problem, "the Framers sought to alleviate [Southern] concerns by completely

3

denying to Congress the power to tax exports at all." *Id.* In accord with this, the Supreme Court has held that "the Export Clause strictly prohibits any tax or duty, discriminatory or not, that falls on exports during the course of exportation." *Id.* at 849.

Nevertheless, despite this broad prohibition on export taxes, the Supreme Court has carved a narrow exception where the charge is actually a "legitimate user fee."[1] *See U.S. Shoe*, 523 U.S. at 367. In other words, Congress may impose a fee which is "simply the compensation given for services properly rendered" by the government. *Pace v. Burgess*, 92 U.S. 372, 375 (1875). In determining whether a charge on an export is a tax or a legitimate user fee, the Supreme Court has instructed courts "to guard against…the imposition of a [tax] under the pretext of fixing a fee." *Id.* at 376

Despite being decided almost 150 years ago, "[t]he guiding precedent for determining what constitutes a bona fide user fee in the Export Clause context remains [the Supreme Court's] time-tested decision in *Pace*." *U.S. Shoe*, 523 U.S. at 370. In *Pace*, Congress imposed an excise tax on tobacco. Congress enacted a sister provision exempting tobacco intended for export from taxation. To prevent fraud, Congress required all tobacco intended for export to have a stamp affixed to its packaging. Exporters had to purchase these stamps. The stamp had a predetermined value and there was no limit as to the size or value of the tobacco to which each stamp was affixed.

The Court upheld the stamp charge finding that it was "a fee or charge[] for the employment of that instrumentality which the circumstances of the case render necessary for the protection of the government." *Pace*, 92 U.S. at 376. In a later case, the Supreme Court noted that the *Pace*

---

[1] In its briefing, Trafigura argues that the Government waived its ability to argue that the charge imposed under § 4611(b) is a valid user fee because it did not plead that argument as an affirmative defense. At the hearing, the Court found that this argument was not a surprise and that considering the binary nature of the inquiry the Government could and did appropriately raise the issue.

4

court emphasized two guiding characteristics in finding that the stamp charge was a legitimate user fee:

> It 'bore no proportion whatever to the quantity or value of the package on which [the stamp] was affixed'; and the fee was not excessive, taking into account the cost of arrangements needed both 'to give to the exporter the benefit of exemption from taxation, and ... to secure ... against the perpetration of fraud.'

*U.S. Shoe*, 523 U.S. at 369.

The Supreme Court applied the *Pace* test over one-hundred years later in *U.S. Shoe* and found that the Harbor Maintenance Tax ("HMT") was indeed a tax and as such violated the Export Clause. *Id.* The HMT imposed an ad-valorem charge of 0.125% on the value of commercial cargo moving through the nation's ports. Collections of the HMT were deposited into a fund that was used to pay for harbor maintenance and development projects. The Supreme Court struck down the HMT finding that it was an unconstitutional tax on exports. In so ruling, the Court found that "[u]nlike the stamp charge in *Pace*, the HMT is determined entirely on an ad valorem basis." *Id.* at 369. Further, the Court noted that "the value of export cargo...does not correlate reliably with the federal harbor services used or usable by the export" because the extent and manner of port usage depends on a number of factors for which the ad valorem charge did not take into account. *Id.* In closing, the Court noted that exporters could still be charged user fees to pay for costs of harbor upkeep, but "such a fee must fairly match the exporters' use of port services and facilities." *Id.* at 370.

Based upon *Pace* and *U.S. Shoe*, the Court finds that the test for whether a charge is a tax, as opposed to a valid user fee, can be effectuated by two-part inquiry: (1) whether the charge is determined based on its proportion to the quantity or value of the package, *see id.* at 369; *Pace*, 92 U.S. at 375; and 2) whether the charge is excessive or whether it fairly matches the exporter's use of the services provided by the funds raised from the charge. *U.S. Shoe*, 523 U.S. at 369; *Pace*,

5

92 U.S. at 375. Charges that are proportionate to the quantity or value and that are excessive with respect to the exporter's use of the service provided are more likely to be considered taxes on exports. On the other hand, charges which are not based on their proportion to the quantity or value of the export and which fairly match the cost of exporter's use of the services provided are more likely to be considered legitimate user fees. Under both of these prongs, the charge imposed under § 4611(b) is an unconstitutional tax on exports.[2]

### A.

The first prong of the *Pace* inquiry asks whether the charge is determined based on its proportion to the quantity or value of the package. On its face, the tax[3] imposed under § 4611(b) fails this prong. Today, the charge, by its own terms, is equal to "the Oil Spill Liability Trust Fund financing rate." 26 U.S.C. § 4611(c)(1).[4] That rate, which is fixed by statute, is equivalent to 8 or 9 cents per barrel of crude oil, depending on the date of export. § 4611(c)(2)(B). "The term 'barrel' means 42 United States gallons." § 4612(a)(8). The Government contends that Congress "designed the exaction under § 4611 to track the use of American infrastructure on a per barrel basis," and while it "charged all users the same flat fee, it tailored the benefit each receives—the liability cap—based on other factors." (Doc. No. 32 at 15). While that may be relevant to the second factor (the issue of excessiveness), it does not change the fact that the charge imposed under § 4611(b) is determined based on its proportion to the quantity of the oil exported. This is true down to a fraction of a barrel. *See* § 4612(a)(9) ("In the case of a fraction of a barrel, the tax

---

[2] Trafigura contends that the failure to meet either of the prongs of the *Pace* inquiry is fatal to the Government's case. The Government disagrees, but since this ruling finds both prongs are unmet, the Court need not decide that issue.

[3] While the Supreme Court has instructed courts to "'regard things rather than names' in determining whether an imposition on exports ranks as a tax," *see U.S. Shoe*, 523 U.S. at 367, the Court notes initially that Congress chose to label the charge under § 4611(b) as a "tax on . . . domestic crude oil . . . exported from the United States."

[4] Under the actual language of the statute, the charge is equal to "the sum of the Hazardous Substance Superfund financing rate, and…the Oil Spill Liability Trust Fund financing rate." 26 U.S.C. § 4611(c)(1). As a practical matter, the parties agree that this calculation only equates to the Oil Spill Liability Trust Fund financing rate because the tax attributable to the Hazardous Substance Superfund financing rate expired.

imposed by section 4611 shall be the same fraction of the amount of such tax imposed on a whole barrel."). Therefore, a resolution of the first prong of the *Pace* inquiry suggests that the charge imposed under § 4611(b) is a tax, not a user fee.

### B.

The second prong of the *Pace* inquiry asks whether the charge fairly matches the exporter's use of the services provided by the funds raised from the charge. The Government argues that the payments into the Fund are premiums paid for the Government's administration of an oil spill liability insurance program in exchange for the liability cap found in 33 U.S.C. § 2704, and therefore, are not taxes. According to the Government, the charge here fairly matches the benefit provided because the funds paid "are not excessive considering the benefit to users like Trafigura (statutory cap in liability) and the cost to the government (cabining oil spill costs to importers, refiners, and exporters)." (Doc. No. 32 at 16).

Trafigura argues to the contrary that the charges paid into the Fund cannot be considered valid user fees because the Fund is available for a wide range of objectives aside from the liability cap. Additionally, Trafigura argues that in enacting the charge under 26 U.S.C. § 4611(b) Congress failed to tailor the charges to fairly match the use of the Fund nor is it in any way tailored to any "benefit" provided by the liability cap. Further, Trafigura maintains that it does not receive any benefit from the service because it has never been liable for an oil spill, and also contends that, as a commodities brokerage house, it could never be found to be a "responsible party" under 33 U.S.C. § 2702.

The Court agrees with Trafigura on the first two points. To begin, it is evident from the broad statutory mandate that the Fund is set up more as a public fisc than an insurance fund. It is clearly a way for the Government to make private industry fund a wide-ranging oil spill relief

program. Apart from handling or monitoring various aspects of liability clean up, the Fund also appropriates money to a variety of other activities. Notably, the Fund is available to federal, state, and Indian tribes to assess natural resource damages and implement plans for restoration, rehabilitation, and replacement of damaged resources, as well as for payment of removal costs from a foreign offshore unit. *See* 33 U.S.C. § 2712; *see also* 26 U.S.C. § 9509 (permitting expenditures "for the payment of removal costs and other costs, expenses, claims, and damages referred to in section [2712 of the Oil Pollution Act]."). Even more striking, the Fund appropriates millions of dollars for research and development of oil spill technology, studies on the effects of pollution, marine simulation research, demonstration products involving a number of ports, simulated environmental testing, a regional research program, and founding an Oil Spill Recovery Institute. *See* 33 U.S.C. § 2712(a)(5)(D) (appropriating funds); 33 U.S.C. § 2761(c)(2–10); 33 U.S.C. § 2731.[5] While each of these projects may be laudable, they have little to do with providing oil exporters a "government service" that justifies a per-barrel fee.

Keeping in mind that the Government has argued here that the benefit for which the fees are collected is the liability cap, the Court also finds that Congress did not tailor the charge imposed under § 4611(b) to "fairly match the exporters' use of" the government service. The Government argues that the charge imposed here, a flat per-barrel fee, fairly matches the use. The Court understands the simplicity this contention offers. Indeed, one might argue that the more oil per barrel that is transported over navigable waters, the more risk there is of potential spills into navigable water. A spill results in a need for clean-up, and therefore, the more oil that is

---

[5] These depict only the uses permitted under the Oil Pollution Act. The Fund is also available for the purpose of making expenditures: to carry out sections 5 and 7 of the Intervention on the High Seas Act relating to oil pollution or the substantial threat of oil pollution; for the payment of liabilities incurred by the revolving fund established by section 311(k) of the Federal Water Pollution Control Act; to carry out subsections (b), (c), (d), (j), and (l) of section 311 of the Federal Water Pollution Control Act with respect to prevention, removal, and enforcement related to oil discharges (as defined in such section); for the payment of liabilities incurred by the Deepwater Port Liability Fund; and for the payment of liabilities incurred by the Offshore Oil Pollution Compensation Fund. *See* 26 U.S.C. § 9509(c).

transported, the higher the risk that the Fund may be called upon to make payments. Also, the more oil any one responsible party ships, the more likelihood of a spill and consequently the more likely that a responsible party may benefit from the liability cap. Nevertheless, the Supreme Court's standard espoused in *U.S. Shoe* demands more. There, the Court found that the value of the export cargo did not correlate reliably to the harbor services required and that a number of other factors played into the extent and manner an exporter may use the port.

The same is true here. Even accepting the Government's proposition that the Fund operates as "insurance" for exporters (an argument Trafigura strongly disputes), a number of other factors could and, considering the strict prohibition in the Export Clause, should have been considered with respect to the charge on oil exporters. Importantly, the Coast Guard, which administers the Fund, has identified "key factors that drive up claims costs," including: the location of the spill; the type of oil spilled; the area and length of time for fisheries closures; affected traffic and length of time for shipping lane closures; the population and commercial density of the affected area; the magnitude and length of time for business interruptions; the types of natural resources impacted by the spill; and the extent of impact on environmentally sensitive areas. (Doc. No. 49-1 at 11). At least a few of these factors, combined with other general principles from insurance contracts, would have provided a fuller picture while calculating the tax. For example, the Court finds the following factors could have been considered to structure a fee which more closely matches the service rendered: (1) the route taken by the vessel, *see also infra*; (2) the route's proximity to places with higher risk due to, among other things, commercial density or protected natural resources; (3) the time the vessel will spend in "navigable waters" as that term is defined in 33 U.S.C. § 2701(22); (4) the quantity of oil carried on the cargo ship; (5) the statutory limit applicable to the cargo ship carrying the oil; and (6) the characteristics of the exporter, including past safety

records and current safety controls. This is not an exhaustive list, but it demonstrates Congress's failure, in contravention of the test set out in *Pace* and *U.S. Shoe*, to tailor the charge in a way that fairly matches the governmental service that the tax/fee is supposed to support.[6]

Additionally, a bigger problem exists. At least some portion of Trafigura's exports travel by truck from North Dakota to Canada. *See* (Doc. No. 21-2). The Plaintiff pays the same per-barrel "fee" on these exports. While oil that leaves the United States through a seaport will necessarily travel over navigable waterways, the same cannot be said of exports traveling to Canada by truck. The limitation of liability contained in the Oil Pollution Act does not apply to oil being trucked over land. There is no provision that distinguishes the manner by which the oil exports travel. Even if one assumes the accuracy of the Government's argument, Trafigura gets no benefit at all for the "fee" it pays on these land-based oil exports. The limits on liability found in 33 U.S.C. § 2704 only apply to responsible parties under 33 U.S.C. § 2702, and that section is limited to oil spills or discharges into "navigable waters or adjoining shorelines." The Framers included the Export Clause in the Constitution to alleviate the "fear[] that the Northern States would control Congress and would use taxes and duties on exports to raise a disproportionate share of federal revenues from the South." *IBM*, 517 U.S. at 859. A somewhat similar fear is realized in the tax imposed under § 4611(b). The tax raises money from exports leaving the country from landlocked states to subsidize "benefits" enjoyed by exports leaving the country from states enjoying port access. This clearly violates the original intent of the Export Clause, and the Court

---

[6] While the Government maintains that the sums imposed by § 4611 are "fees for services rendered," this argument is also undermined by the original structure of the statute. Originally, the tax was calculated by adding the Hazardous Substance Superfund financing rate to the Oil Spill Liability Trust Fund financing rate. *See* § 4611(c)(1). To be constitutional at that time, those two rates together had to equate to the value of the liability cap. Today, that calculation simply equates to the Oil Spill Liability Trust Fund financing rate because the Hazardous Substance Superfund financing rate has expired. *See* § 4611(e)(1). Consequently, to be constitutional now the value of the cap must diminish to be equal only to the Oil Spill Liability Trust Fund financing rate. In other words, it is hard to argue that the combination of the two financing rates were tied to the value of the cap, but now only the individual Oil Spill Liability Trust Fund financing rate equates to that same value. Both of these positions can hardly be accurate.

finds this issue alone is dispositive.[7] Even if it were not, it demonstrates conclusively that the charge does not fairly match the exporter's use of the services provided by the funds raised from the charge.[8]

## C.

The Court has found that the tax imposed under 26 U.S.C. § 4611(b) really is a tax because it is determined based on its proportion to the quantity or value of the package and that it does not fairly match the exporter's use of the services provided by the funds raised from the charge. Therefore, in accord with the Supreme Court's decisions in *Pace* and *U.S. Shoe*, the tax imposed by § 4611(b) is an unconstitutional tax on exports. Trafigura's motion for summary judgment (Doc. No. 22) as to liability is **GRANTED**. The Government's motion (Doc. No. 43) is **DENIED**.

## IV.

The next question is what the proper remedy is in this suit. Trafigura contends that it is entitled to a full refund of the taxes that they paid plus statutory interest. *See* (Doc. No. 21 at 15). The Government argues that under principles of equity Trafigura must show that it actually bore the economic burden of the taxes, i.e. that it did not pass the taxes on to its customers. The Court

---

[7] The Government suggested at the Court's hearing on this motion that the charges imposed on the North Dakota exports could be severed from the other costs and that the Plaintiff had not proven its oil never crosses a navigable stream. Although this Court concedes that it is possible that a truck could spill oil in North Dakota that could conceivably end up in a navigable stream, the Government's suggestion that the tax can be constitutional in places or at times and unconstitutional in others does not pass muster. Moreover, this Court does not agree that such a proposition is supported by legal precedent as it has found no case in which the Supreme Court did an exporter-by-exporter analysis. For example, in *U.S. Shoe*, the Supreme Court flatly found that "the HMT violates the Export Clause." 523 U.S. at 370. Moreover, the remedy adopted by the Framers to alleviate the fear described above was to "completely deny[] to Congress the power to tax exports at all." *IBM*, 517 U.S. at 859. Where a charge disproportionately discriminates between exports from different states such that it is arguably a service fee in one state, but clearly a tax in another, the Court believes the proper remedy is to find all taxes imposed under that provision to violate the Export Clause.

[8] The Court notes that it does not address an important argument made by Plaintiff. As noted above, it claims that, as a commodities brokerage house, it has not been, nor will it ever be, in a position to benefit from the liability cap. Further, the amount of the tax fixed by Congress has no relationship to any benefit it (or any other company like it) derives from this cap. Therefore, there is no value received. Further, even assuming the cap acts as insurance, there is the additional, more theoretical argument of: what is the value of insurance that one never uses? The answers to this question may vary greatly depending on whether one is paying or receiving the premium payments. Given this Court's ruling, it need not address this issue.

believes this issue would benefit from further factual development and briefing. Therefore, the Court **DENIES** each side's motion for summary judgment as to remedy without prejudice to refiling. The parties are to confer and jointly propose an appropriate schedule to govern this case to conclusion. This should be filed by September 30, 2020.

## V.

For the foregoing reason, the Court **GRANTS IN PART** and **DENIES IN PART** Trafigura's motion for summary judgment. (Doc. No. 22). The Government's motion for summary judgment is **DENIED**. (Doc. No. 43).

Signed this 8th day of September, 2020.

Andrew S. Hanen
United States District Judge